*Virginia: In the Circuit Court of Fairfax County*

*Virginia: In the Circuit Curt of Fairfax*

~~IN THE UNITED STATES DISTRICT COURT~~

~~FOR THE~~

~~EASTERN DISTRICT OF VIRGINIA~~

~~FAIRFAX DIVISION~~

|  |  |
|---|---|
| M.O., a minor, ~~by and through~~ *by through* his mother and next friend C. O. , *AND C.D.* | Case No. __2021    07955__ |
| Plaintiffs, | |
| v. | |
| **FAIRFAX COUNTY PUBLIC SCHOOLS,** | |
| Defendant. | |

FILED
CIVIL INTAKE
2021 MAY 27 P 3:32
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

*JANE STRONG*
*Fairfax County Public Schools*
*8115 Gatehouse Rd.*
*Falls Church, VA 22042*

**COMPLAINT**

The parent of M.O., Callie Oettinger, brings this action pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. 1400, seq. and its federal and state implementing regulations, 34 C.F.R. Part 300; 8 VAC-20-81-10 (g) seq. (collectively "IDEA") . The parent seeks reversal of the Hearing Officer's November 30, 2020, decision, to the extent that the decision was adverse to the parent and/or child and seeks a ruling in favor of the parent and/or child. The aspects of the Hearing Officer's Decision that were adverse to the parent and/or child were not supported by the law, evidence, testimony, or the facts in this matter.

### JURISDICTION

1) The subject matter jurisdiction of this Court is invoked pursuant to 20 U.S.C. 1415.

2) IDEA includes provisions conveying rights to parents as well as to children.

1

**EXHIBIT A**

## PARTIES

3) M.O., is the minor child of C.O. his mother and next friend.

4) C.O. is the mother and next friend of M.O.

5) Fairfax County Public Schools ("FCPS") is the Local Education Agency (LEA) and was at all times relevant herein place where the child was placed for educational purposes by his parents.

## FACTS

### 1. Due Process Hearing

6)  Due process hearing took place September 30, October 1, October 2, October 13, October 14, October 15, and October 19 of 2020. (See Exhibit 1)

7) Throughout the hearing, the hearing officer failed to follow federal and/or state regulations for due process hearings and due process hearing training, and indicated that she has not been trained as regulated by federal and state regulations. The evidence included in the below and in hardcopies included with this complaint buttress this statement.

8) Throughout the hearing, the hearing officer deferred to FCPS and its counsel; believed unsupported statements by FCPS witnesses as fact; refused to allow documentation from parent that proved the witnesses had committed perjury; expressed frustration with parent's struggles with an online format that parent had not been trained to use for the due process hearing; expressed frustration with parent's questioning even though a due process hearing is supposed to be an avenue for parents to use for grievances; failed to heed parent's advance warnings about privacy breaches, FCPS and its counsel obtaining the transcripts in advance, FCPS withholding information, and so on; and with the number of emails submitted by the parent, to the point that the hearing officer noted the number of emails in her decision, indicating that the emails negatively impacted her decision and the hearing. The following information and the evidence included validates the emails submitted by the parent. There are no federal or state regulations dictating the number of emails that can/cannot be submitted during a hearing. (See Exhibit 19)

2

9) During the pre-hearing and hearing, parent expressed concerns to the hearing officer that FCPS would withhold information, breach privacy, provide false testimony, and take actions that aren't in good faith, and/or provide false testimony. These concerns are based on parent's past experiences with FCPS, for which the Virginia Department of Education (VDOE) has found FCPS in noncompliance on numerous occasions and on FCPS being sanctioned in federal court for destruction of evidence. (See Exhibit 2 and Exhibit 3)

10) 9.4.20 and 9.7.20 parent again brought her concerns to the hearing officer. 9.8.20, the hearing officer stated she had "no objection to having another conference call before the 21st". The hearing officer issued a formal notice for a second prehearing conference and included "confidentiality" as a topic for discussion. The metadata for this document and for other documents issued by the hearing officer list the company associated with the document as "U.S. Army". To date, the hearing officer has not explained why M.O.'s information was being shared and associated with the U.S. Army. (See Exhibit 4 and Exhibit 5)

11) 9.13.20, the hearing officer issued a prehearing report that documents parents continued concerns about privacy breaches and stated:

"During the September 11th conference call, Ms. Oettinger expressed concern regarding the handling of [redacted]'s records and a possible breach of confidentiality by FCPS and their counsel. She provided several examples of former confidentiality and privacy breaches for which FCPS had been cited as being in noncompliance due to error or negligence. Apparently student records, including [redacted]'s records, had been forwarded to the wrong party(ies) in the past. This alleged pattern of breach is of concern to the Hearing Officer.

"Counsel for FCPS recommended that the records be received and held under the shield of a protective order. The Hearing Officer accepts this recommendation. Accordingly, counsel for FCPS is hereby directed to promptly draft a protective order for entry by the Hearing Officer. The protective order will be designed to maintain confidentiality and insure privacy of any and all documents related to [redacted] that are either held by or received by FCPS or their counsel." (See Exhibit 6)

3

12) 9.14.20, FCPS issued the Protective Order it drafted.
(See Exhibit 7)

13) 9.18.20, first privacy breach occurred. FCPS counsel emailed parent that he would be couriering her educational records for "Sam". Neither parent nor M.O. are named "Sam". Parent emailed FCPS counsel to make him aware of his error. He would be committing a privacy breach if those thumb drives were provided to parent.  (See Exhibit 8)

14) 9.21.20, second privacy breach occurred. FCPS counsel made parent and hearing officer aware that FCPS had breached privacy and requested that parent return thumb drives that had been provided to her. (See Exhibit 2)

15) In her 9.21.20 "Fourth Prehearing Order", the hearing officer admonished FCPS and its counsel for the privacy breach. The hearing officer noted parent's statement that FCPS withheld documents, but believed FCPS's statement that it did not. The hearing officer also made an issue about the number of emails submitted by the parent. The parent's emails included concerns to the hearing officer that FCPS would withhold information, breach privacy, provide false testimony, and take actions that aren't in good faith, and/or provide false testimony. The parent's proactive warnings proved her to be in the right. (See Exhibit 2)

16) Third privacy breach occurred. In its evidence books, FCPS provided parent the personal phone numbers, email addresses, and/or home addresses for FCPS staff and a recently-retired staff member.

17) Fourth privacy breach occurred. 10.27.20, FCPS provided parent a transcript for a different family's due process hearing. The family has a son named Sam. FCPS tried to recall the email, but it had already gone through. (See Exhibit 9)

18) The hearing officer indicated that FCPS and its counsel were to obtain and distribute the transcripts, which caused parent to worry that the hearing officer was assigning her federal and state regulated duties to FCPS and its counsel, and that parent would be put at a disadvantage.

19) Per § Sec. 300.181(p)(i) of the Individuals with Disabilities Education Act (IDEA): (1) The Hearing Official or Hearing Panel—(i) Arranges for the preparation of a transcript of each hearing; (ii) Retains the original transcript as part of the record of the hearing; and (iii) Provides one copy of the transcript to each party.

20) 10.6.20, parent called transcription firm, Veritext, and Veritext advised her that FCPS's counsel was its client, that it had ordered the transcripts, and that the transcripts would start being delivered to FCPS's counsel the next day. Parent emailed the hearing officer to make her aware that FCPS counsel had arranged to have the hearing transcripts sent to its firm in advance of the parent and the hearing officer. (See Exhibit 10)

21) 10.4.20, a mid-hearing conference was held to address the transcripts. FCPS counsel J.C. ripped into parent in an email and stated information that contradicted the information provided by numerous Veritext employees, "I really do object to us having to drop everything to yet again accommodate Ms. Oettinger's umpteenth quibbling email"; "I myself have instructed the firm more than once to send the transcript to Ms. Schaefer's office – because they pay for it – which in turn sends it to the hearing officer, the parent or attorney, and our firm at the same time"; and " Finally, we do not receive a copy of the recording. We never do. I have had people ask for it, but to my knowledge the recording is the property of the court reporter, and they use it to check if there are any ambiguities in the transcript, but do not release it to others." (See Exhibit 11) During the mid-hearing conference, parent asked the hearing officer if should would confirm that Veritext understood the distribution of the transcripts as regulated by federal and stated regulations. The hearing officer asked the parent why the parent couldn't just do that since the parent showed she could call Veritext. Later, in her decision, the hearing officer admonished the parent for continuing to call Veritext. (See Exhibit 19)

22) 10.8.20, more emails between parent and transcription company Veritext and the hearing officer were exchanged, showing that FCPS had received transcripts in advance, even though FCPS counsel maintained that this did not occur. Soon after FCPS's counsel stated he didn't receive transcripts, Veritext's general counsel, J.K., sent emails to parent that stated FCPS's

counsel and FCPS were sent transcripts earlier that day, and confirmed that FCPS has a portal allowing it to access transcripts at any time online. (See Exhibit 12)

23) 10.9.20, Hearing Officer R.M. ordered that the transcripts were to be provided to everyone at the same time. (See Exhibit 18)

24) 10.22.20, throughout the hearing, parent had trouble with her eyes (she had surgery earlier in the summer) and continued to request the accommodation of audio version of the transcript. (See Exhibit 13)

25) Due to medical based vision disabilities and the doctor ordering reduced reading and screen time, the parent requested an electronic verbatim version in the format of audio.

26) Per § 300.512 of the Individuals with Disabilities Education Act (IDEA): (a) General. Any party to a hearing conducted pursuant to §§ 300.507 through 300.513 or §§ 300.530 through 300.534, or an appeal conducted pursuant to § 300.514, has the right to - (4) Obtain a written, or, at the option of the parents, electronic, verbatim record of the hearing; (c) Parental rights at hearings. Parents involved in hearings must be given the right to - (3) Have the record of the hearing and the findings of fact and decisions described in paragraphs (a)(4) and (a)(5) of this section provided at no cost to parents

27) §§ 300.507 through 300.513 or §§ 300.530 through 300.534, a parent has a right to a verbatim and an electronic copy of the hearing

28) 10.24.20, the hearing officer issued a post-hearing decision in which she denied parent's request for an electronic audio version of the transcript and for an extension to submit her decision, due to parent's need for reduced screen time and reading time. (See Exhibit 14)

29) §8VAC20-81-210(K)(d) of Virginia Administrative Code: K. Rights of parties in the hearing. (§ 22.1-214 C of the Code of Virginia; 34 CFR 300.512) 1. Any party to a hearing has the right to: d. Obtain a written or, at the option of the parent(s), electronic, verbatim record of the hearing

6

30) Mother did not receive a verbatim transcript of the hearing. The transcript lists her as a lawyer, lists her company as the firm representing her son, and lists her company's contact information even though the parent is not a lawyer and never provided anyone information about her company. In addition, the transcripts includes incorrect attributions to different speakers, omits full conversations that occurred, and changes some of the testimony. To date, mother has not received a corrected version of the transcripts. (See Exhibit 19)

31) The hearing officer admonished the parent for the amount of time it took her to present evidence during the hearing, even though the parent never received training on using the online platform chosen by FCPS. The hearing officer became increasingly frustrated when technology failed and blamed parent after parent was kicked out of the hearing and could not log back in. During a pandemic, the hearing officer ordered parent to find a library or a friend's home in which she could attend the hearing. Parent advised the hearing officer that this was impossible due to COVID restrictions. (See Exhibit 19)

32) On the final day, parent's camera and audio stopped working. The parent could log in and hear and see the hearing, but she could not be seen or heard herself. This problem has occurred numerous times with the Blackboard platform that FCPS chose to use, to the point that FCPS made national news due to the disastrous failures related to the program. The parent made the hearing officer and FCPS aware of this problem on numerous occasions. At no point did the hearing officer order the problem to be addressed, nor did FCPS attempt to provide parent full access via its hearing platform of choice. This resulted in the parent not being able to testify. It was not until after the hearing officer asked for closing comments that FCPS advised parent that she could call into the hearing, and provided her a phone number for use to call into the hearing. (See Exhibit 19)

33) Although a due process hearing is supposed to be an avenue for parents to file grievances, the hearing officer continually cited parent for her lack of knowledge of administrative procedures. When a party objects to the adequacy of the education provided, the construction of the IEP, or some related matter, IDEA provides procedural recourse: It requires that a State provide "[a]n opportunity for any party to present a complaint . . . with respect to any matter relating to the

identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." §1415(b)(6). By presenting a complaint a party is able to pursue a process of review that, as relevant, begins with a preliminary meeting "where the parents of the child discuss their complaint" and the local educational agency "is provided the opportunity to [reach a resolution]." §1415(f)(1)(B)(i)(IV). If the agency "has not resolved the complaint to the satisfaction of the parents within 30 days," §1415(f)(1)(B)(ii), the parents may request an "impartial due process hearing," §1415(f)(1)(A), which must be conducted either by the local educational agency or by the state educational agency, ibid., and where a hearing officer will resolve issues raised in the complaint, §1415(f)(3).

34) IDEA sets standards the States must follow in conducting these hearings. Among other things, it indicates that the hearing officer's decision "shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education," and that, "[i]n matters alleging a procedural violation," the officer may find a child "did not receive a free appropriate public education" only if the violation "(I) impeded the child's right to a free appropriate public education; "(II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or "(III) caused a deprivation of educational benefits." §§1415(f)(3)(E)(i)–(ii).

35) IDEA provides for at least two means of cost recovery. First, in certain circumstances it allows a court or hearing officer to require a state agency "to reimburse the parents [of a child with a disability] for the cost of [private school] enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child." §1412(a)(10)(C)(ii). Second, it sets forth rules governing when and to what extent a court may award attorney's fees. See §1415(i)(3)(B). Included in this section is a provision allowing an award "to a prevailing party who is the parent of a child with a disability." §1415(i)(3)(B)(i)(I).

## 2. Due Process Hearing Decision

36) In her decision, the hearing officer failed to base her decision on facts and on federal and state regulations. The evidence included below and with this complaint will buttress this statement. (See Exhibit 1)

37) In her decision, Hearing Officer R.M. stated, "Throughout the hearing process, a barrage of emails was received from petitioner on almost a daily basis. Among other topics, petitioner expressed concerns about the following matters: o  fairness of the process o  credibility and integrity of potential witness testimony o  integrity of FCPS counsel o  integrity of the hearing moderator o  potential breaches of confidentiality and privacy o  perceived conflicts of interest by counsel for FCPS and the moderator and o  the alleged incomplete delivery of her son's educational records. This continuous stream of emails distracted from the true issues of the case." The evidence presented in this complaint and included with it prove that parent was in the right for communicating concerns to the hearing officer. In addition, there is nothing in state or federal regulation that puts a limit on the number of emails parents can submit. (See Exhibit 1)

### A. "Just Words"

38) In her decision, the hearing officer found the program "Just Words" to be inappropriate for M.O. The hearing officer specifically stated:

"Petitioner strongly objects to the use of "Just Words" and produced an article in which the publisher of "Just Words," the Wilson Reading System, asserted that "Just Words" should not be used for students with dyslexia. Petitioner also introduced a recent hearing officer's decision, *VDOE Case #: 20-21*, in which the hearing officer found that the use of "Just Words" for a student with dyslexia was inappropriate.

"Under this circumstance, deference is given to the publisher of the program, Wilson Reading System. Deference is also given to the logic used in the hearing officer's decision. Petitioner has adequately shown that "Just Words" should not be used to address the educational deficits or conditions associated with Max's dyslexia."

(See Exhibit 1)

39) FCPS proposed the program "Just Words" for M.O. for four school years in a row. For four school years in a row parent opposed the provision of "Just Words" to M.O because the publisher of the program states it is not appropriate for students with Dyslexia, and then a different Virginia hearing officer ruled that "Just Words" is inappropriate for students with Dyslexia. Her advocacy

against this program led FCPS staff to "gaslight" and call her difficult, fixated, stuck in the past, uncooperative, and blame her for Max not being provided a reading program. FCPS's counsel made a point of painting the parent as such during the witnesses' testimony. (See Exhibit 19)

## B. IEP Meetings, Parent's Conduct, and Testimony of FCPS Staff

40) The hearing officer. states "Parental cooperation and corroboration are essential to the IEP process. In this case, witnesses credibly and independently described petitioner's overall conduct during IEP meetings as: violent, challenging, abusive, unreasonable, obstructive, problematic, fixated, aggressive, vitriolic, overboard and interfering. Petitioner was described to have hit the desk with her hand and aggressively approach team members during meeting(s). This unacceptable conduct is neither cooperative nor corroborative." These testified statements by FCPS staff do not comport to the factual representations as evidenced in the recordings. The parent provided recordings and transcriptions of the IEP meetings to the hearing officer. The hearing officer said she would review them. (See Exhibit 1)

41) The hearing officer accepts these negative portrayals of parent even though it is hearsay and hearing officer was provided no proof that they actually happened, and even though the comments are in contrast to the audio recordings and transcripts that the parent provided. When the parent contested these statements, the hearing officer chose to believe the school's witnesses without factual basis and in contrast to the audio and transcripts of those meetings. The hearing officer stated "However, the testimony of Mr. McCormally that [M.O.] appears to be withdrawing and becoming reclusive due to this inexplicable hostility between petitioner and FCPS staff is disturbing, should be monitored and put in check before permanent damage is done to [M.O.]." (See Exhibit 1)

42) McCormally started retaliating against parent and calling her violent after parent identified him falsifying documentation related to his provision of compensatory education to M.O as evidenced in M.O's education record. He extended the time that he met with M.O. and included M.O.'s initials on the document to indicate that M.O. even met with

him on a snow day when M.O. was home. As evidenced in the recorded and transcribed IEP meeting, M.O. was forced to point out that he did not insert his initials on the form, on which McCormally falsified that information. The next day, McCormally tried to apologize to M.O. and stated that everyone makes mistakes but did not provide those services he falsely documented to have provided to M.O. At the same time, M.O. pulled his phone from his pocket to stop its buzzing and McCormally immediately accused M.O. of recording him and his behavior was threatening to M.O. As evidenced in the record, Max was unable to access the curriculum and openly communicate with McCormally, his special education teacher, due to the continued display and overt hostility he projected toward M.O. HO Mitchell did not consider, although evidenced in the record, the direct impact of McCormally's actions and behavior on M.O accessing the curriculum. (See Exhibit 1 and Exhibit 19)

43) Evidence of earlier hostility and misrepresentations by M.O.'s then-IEP case manager Sean McCormally is front and center in his "abusive" and "violent" comments about the parent months earlier in his email to Assistant Superintendent Jay Pearson, after McCormally felt his school was not supporting him. (See Exhibit 15) Not long before this, parent caught Sean McCormally presenting falsified data related to the provision of compensatory education to M.O. This resulted in both parent and M.O. have to go through the document and present the false information to the IEP. McCormally's insertion of M.O.'s initials on days M.O. did not meet with McCormally marked the steep decline in their relationship. Parent obtained the email from McCormally to Pearson via a FERPA request and brought it to the attention of principal Gary Morris. Garry Morris assured parent that he had spoken with McCormally about McCormally's false comments. (See Exhibit 16) Yet, McCormally went on to state them again, without any proof, during the hearing. Parent asked Jay Pearson if he found her to be violent. He said, "No", that he found her to be straightforward, brutally honest, and a passionate advocate for her son, and that she had always been respectful toward him.

44) In his testimony, McCormally stated the parent's "violence" and other behaviors are s what led to the first Facilitated IEP Meeting. However, the Facilitated IEP meeting was the

11

first meeting held at the high school and it was the first IEP meeting that Sean McCormally attended, so there is no way that he could have attended two IEP meetings before the facilitated IEP meeting occurred. Although the hearing officer had the IEP attendance sheets that document this timeline she believed McCormally and did not consider the hostile behavior and actions by the special education teacher and case manager to have impacted M.O's ability to receive a FAPE. (See Exhibit 1 and Exhibit 19)

45) During the hearing, McCormally was asked if he had ever been reprimanded by anyone for his comments about the parent, even though the principal advised the parent that he had reprimanded McCormally. His statements do not comport to the evidence of record. (See Exhibit 16 and Exhibit 19)

46) During the hearing, McCormally continued to commit perjury when he stated that all of M.O.'s IEP was implemented. McCormally had to provide M.O. compensatory education because the IEP was not implemented in full and FCPS was found in noncompliance due to M.O. IEP not being implemented in full for the majority of the school year that McCormally was IEP case manager. Although parent pointed to VDOE Letters of Findings to show FCPS's continued noncompliance, the hearing officer believed McCormally, who had provided not one ounce of proof to buttress his statements. (See Exhibit 19)

47) Mother spent four school years advocating against a program she knew was inappropriate for M.O. FCPS staff ignored her and didn't take her input into consideration, hence it continued to propose the same program four years in a row. While a petitioner might not be entitled to everything she wants in the IEP, she should not be forced to accept a program that she knows is to be inappropriate. However, the hearing officer wrote: "Petitioner is here again admonished that the IEP team must work together for Max's best interest. Petitioner attended all of the IEP meetings and there was no evidence that team members ignored her or her in-put. Petitioner, as one member of the IEP team, has no authority to dictate to the rest of the team. Petitioner is not entitled to have everything she wants in the IEP." The hearing officer did not consider the parent's right to provide

12

informed consent. As evidenced in the documents and testimony, the parent was not provided an explanation as to why FCPS rejected her opinion and why FCPS continued to propose "Just Words", even after a different hearing officer determined almost a year earlier that "Just Words" is inappropriate for students with Dyslexia. (See Exhibit 1 and Exhibit 19)

48) Current IEP case manager Tina Wrubluski indicated that she discriminated against M.O.'s IEP, but maintained that M.O.'s IEP was fully implemented and that he received FAPE. In her testimony, T.W. stated that she took M.O.'s chemistry quizzed because, in her professional opinion, M.O. did not need more time. M.O. has testing to completion on his IEP. During the hearing, the hearing officer allowed M.O. to ask T.W. about this. M.O. pointed out that he told her he wasn't finished. T.W. maintained that in her professional opinion, M.O. did not need more time. This is both discrimination of M.O. and failure to implement M.O.'s IEP, but the hearing officer believed T.W., too.  (See Exhibit 1 and Exhibit 19)

49) IDEA Act makes parents real parties in interest to IDEA actions, not "mer[e] guardians of their children's rights."

50) The goals of IDEA include "ensur[ing] that all children with disabilities have available to them a free appropriate public education" and "ensur[ing] that **the rights of children with disabilities and parents of such children are protected.**" 20 U. S. C. §§1400(d)(1)(A)–(B) (2000 ed., Supp. IV).

51) IDEA requires school districts to develop an IEP for each child with a disability, see §§1412(a)(4), 1414(d), with parents playing "a significant role" in this process, Schaffer v. Weast, 546 U. S. 49, 53 (2005).

52) Parents serve as members of the team that develops the IEP. §1414(d)(1)(B). The "concerns" parents have "for enhancing the education of their child" must be considered by the team. §1414(d)(3)(A)(ii).

53) IDEA accords parents additional protections that apply throughout the IEP process. See, e.g., §1414(d)(4)(A) (requiring the IEP Team to revise the IEP when appropriate to address certain information provided by the parents); §1414(e) (requiring States to "ensure that the parents of [a child with a disability] are members of any group that makes decisions on the educational placement of their child"). The statute also sets up general procedural safeguards that protect the informed involvement of parents in the development of an education for their child. See, e.g., §1415(a) (requiring States to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education"); §1415(b)(1) (mandating that States provide an opportunity for parents to examine all relevant records). See generally §§1414, 1415. A central purpose of the parental protections is to facilitate the provision of a "'free appropriate public education,'" §1401(9), which must be made available to the child "in conformity with the [IEP]," §1401(9)(D).

54) IDEA mandates that educational agencies establish procedures "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education." §1415(a). It presumes parents have rights of their own when it defines how States might provide for the transfer of the "rights accorded to parents" by IDEA, §1415(m)(1)(B), and it prohibits the raising of certain challenges "[n]otwithstanding any other individual right of action that a parent or student may maintain under [the relevant provisions of IDEA]," §§1401(10)(E), 1412(a)(14)(E).

55) The IEP proceedings entitle parents to participate not only in the implementation of IDEA's procedures but also in the substantive formulation of their child's educational program. Among other things, IDEA requires the IEP Team, which includes the parents as members, to take into account any "concerns" parents have "for enhancing the education of their child" when it formulates the IEP. §1414(d)(3)(A)(ii). The IEP, in turn, sets the boundaries of the central entitlement provided by IDEA: It defines a "'free appropriate public education'" for that parent's child. §1401(9).

56) The IEPs were not written in line with federal and/or state regulations, for which FCPS was found in noncompliance on numerous occasions. FCPS did not like the parent insisting that language in the IEPs be as clear as possible so it couldn't be misinterpreted. In addition, FCPS failed to have appropriate experts attend IEP meetings for M.O. The following lists the number of IEP meetings and shows that the number of IEP meetings is directly related to FCPS's noncompliance, with the majority of the noncompliance and IEP meetings occurring when Sean McCormally was M.O.'s IEP case manager:

· Summer 2016:

Max's initial IEP was developed.

At no point did a psychologist, counselor, reading and/or Dyslexia expert, speech/language pathologist, audiologist, occupational therapist, or anyone else whose specialties related to Max's needs, attend any of the meetings.

3 = Number of IEP Meetings (6.9.16, 6.20.16, 6.29.16)

2 = Number of IEP meetings with one of Max's general education teachers in attendance (6.9.16 and 6.20.16)

1 = Number of Addendum Without Meeting (12.13.16)

2 = Number of Eligibility Meetings (5.8.16 and 8.2.16)

1 = Number of Eligibility Meetings with one of Max's general education teachers in attendance (5.8.16)

· 2016-17 school year

2 = Number of IEP Meetings (6.2.17, 6.16.17)

At no point did a psychologist, counselor, reading and/or Dyslexia expert, speech/language pathologist, audiologist, occupational therapist, or anyone else whose specialties related to Max's needs, attend any of the meetings.

· 2017-18 school year

   3 = Number of IEP Meetings (8.18.17, 9.27.17, 12.6.17)

   1 = Number of IEP/Reevaluation Meetings (8.22.17)

   1 = Number of IEP/Eligibility Meetings (9.7.17)

   At no point did a reading and/or Dyslexia expert, speech/language pathologist, audiologist, occupational therapist, or anyone else whose specialties related to Max's needs, attend any of the meetings.

   * A psychologist attended the reevaluation and eligibility meetings.

   6 = Number of VDOE noncompliance findings from the 2016-17 school year and beginning of the 2017-18 school year.

· 2018-19 school year:

   1 = Number of corrective action plan/IEP meetings

   1 = Number of IEP meetings held without parent

   17 = Number of IEP Meetings 2.13.18, 4.13.18, 4.25.18, 5.4.18, 6.14.18, 6.19.18, 7.19.18, 8.15.18, 11.26.18, 12.6.18, 12.11.18, 2.22.19, 3.12.19, 3.20.19, 5.3.19, 5.14.19, 5.20.19,)

   2 = Number of facilitated IEP meetings (10.5.18 and 11.2.18)

   At no point did a reading and/or Dyslexia expert, speech/language pathologist, audiologist, occupational therapist, or anyone else whose specialties related to Max's needs, attend any of the meetings.

   *Psychologist attended both FIEP meetings.

   *AT specialist attended 8 meetings (2.6.18, 2.13.18, 4.13.18, 4.25.18, 5.21.18, 6.14.18, 6.19.18)

5 = Number of VDOE noncompliance findings from the 2018-19 school year, with some of the violations lasting the majority of the year.

4 = Number of issues not addressed by VDOE:

    o Sean McCormally not providing compensatory education as outlined

    o Sean McCormally providing incorrect documentation of his provision of compensatory education (to include him supposedly meeting Max on a snow day and Max's initials appearing on the spreadsheet, even though Max didn't insert them or meet McCormally on those days.

    o Chris Walton losing one of Max's tests and  it taking Oettinger months to have the issue addressed.

    o Chris Walton cussing at Max during a meeting she had with Max, Oettinger, and assistant principal Kaaren Lowder.

Summer 2019 and 2019/20 school year:

9 = Number of IEP meetings. (7.25.19, 8.13.19, 8.14.19, 9.10.19, 12.9.19, 2.5.20, 2.20.20, 3.9.20, 6.2.20)

1 = Number of Eligibility/IEP Meetings (8.12.19)

1 = Number of Evaluation Review/IEP Meetings (9.10.19)

*Psychologist attended 8.12.19 eligibility meeting and then either that psychologist or a different psychologist attended the five following meetings, to include the evaluation review meeting and the meetings related to addressing world language and ATS services, and auditory memory and processing.

*For the first time since Max has had an IEP, that a social worker attended a meeting (eligibility meeting, 8.12.19), a speech language pathologist attended a meeting (11.6.19) a communications disorder specialist attended a meeting (9.10.19), and a Dyslexia expert attended a meeting (9.10.19).

**4 = Number of issues not addressed by VDOE:**

o Max's Chemistry teacher failed to provide Max his testing accommodations.

o Tina Wrubluski, as indicated during her testimony, thought she had the freedom to implement Max's accommodations as she saw fit.

o Wrubluski failed to make anyone aware that Max's tests were sitting on her desk. A month after the school building closed due to COVID, Oettinger had to contact Principal Gary Morris to make him aware of the situation. This indicated, too, that in the month that followed, Wrubluski was not in touch with Max or his teachers.

o Oettinger had to take over Max's schedule twice because Wrubluski took weeks to respond. In one case, Oettinger created a spread sheet and gave Wrubluski access. Three weeks passed before she accessed it. She made one change, and then weeks passed again.

§ Refer to FCPS exhibit 079-001 and look at Max's Algebra II grades. He has a D+ for the first quarter, an incomplete for the second quarter and first semester, an A- during the third quarter and a B as a final grade.

His teacher worked with Oettinger and with Max, granting Max a lot of flexibility to finish assignments from the second and third quarters all the way into the fourth quarter, when school buildings were closed due to COVID.

This was the case in other classes, too – specifically Chemistry and History. As his History teacher Sean Anderson testified, he worked with Max to make up the work, and had a lot of patience with him. However, Anderson and Max's other teachers replaced the earlier poor grades. The Algebra II teacher did not.

This is an example of FCPS and its counsel wanting to show the end product, but when you look deep, there was a lot of struggle along the way.

**2020/21**

1 = Number of IEP meetings (as of 9.2.20)

*Psychologist and Communication Specialist attended one meeting each (9.2.20) - the one at which Dr. Lucker presented his report.

**For the first time since Max has had an IEP a counselor attended (2.5.20 and 6.2.20) and an employment transition specialist attended a meeting (2.5.20 and 6.2.20)

### C. Deference to Educators

57) The hearing officer stated, "Several FCPS special education experts testified that "Just Words" would be the best program for Max." (See Exhibit 1)

58) Although the hearing officer found those educators to be incorrect in their four-school-years long proposal of "Just Words" to M.O., the hearing officer stated that deference should be given to these same educators and admonished the parent for the parent's four-school-years-long advocacy against a program the educators continued to propose. (See Exhibit 1)

59) The hearing officer specifically stated, "Although petitioner disagreed in her closing brief that FCPS should be afforded deference, case law dictates that local educators should be afforded latitude when determining the IEP most appropriate for a disabled child. The IDEA was not designed to deprive local educators of the right to apply their professional judgment. Instead, it should establish a "basic floor of opportunity" for every handicapped child. *See Rowley,* 458 U.S. at 201. States must provide specialized instruction and related services "sufficient to confer some educational benefit upon the handicapped child," id. at 200, but the Act does not require "the furnishing of every special service necessary to maximize each handicapped child's potential," id. at 199. Local educators should be given deference when educating a disabled child. *T.B., Jr. by and through his Parents, T.B., Sr. and F.B. v. Prince George's County Board of Education,* et al., 897 F.3d 566 (4th Cir., 2018). Such is the case here.

"FCPS clearly provided Max with a basic floor of opportunity to educationally succeed and progress. FCPS personnel, as educational professionals, should be given deference. As mentioned above, the parties must work together for the best interest of Max. This does not mean that petitioner must accept whatever FCPS recommends without input, however, it is a necessity that petitioner work with the school officials, and to sometimes compromise, so long as Max's educational needs are met. In this case, petitioner's intense distrust of FCPS appears to have hindered her ability to compromise as well as inflame her reluctance to afford FCPS educators the deference they deserve."
(See Exhibit 1)

60) Deference does not have to be given to educators and should not have been given to the same educators who incorrectly proposed an inappropriate program for M.O. four years in a row and who during the course of those four years routinely chided, maligned, and ignored parent's documentation the "Just Words" is not appropriate for M.O.

61) Chief Justice Roberts addressed the issue of deference to educators in his opinion following the hearing for *Endrew F. vs Douglas County School*. Although Chief Justice Roberts did, indeed, confirm the principle of deference to educators, he included a caveat, too: "deference is based on the application of expertise and the exercise of judgment by school authorities." Deference is not something to be given just for the sake of giving it. How the educators did or didn't apply their expertise and how they exercised their judgement must be weighed when determining whether deference is due.

*"When all is said and done, a student offered an educational program providing "merely more than de minimis" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly . . . awaiting the time when they were old enough to 'drop out.'" Rowley, 458 U. S., at 179 (some internal quotation marks omitted). The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances. . . .*

*"We will not attempt to elaborate on what "appropriate" progress will look like from case to case. It is in the nature of the Act and the standard we adopt to resist such an effort: The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created. This absence of a bright-line rule, however, should not be mistaken for "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U. S., at 206.*

*"At the same time, deference is based on the application of expertise and the exercise of judgment by school authorities. The Act vests these officials with responsibility for decisions of critical importance to the life of a disabled child. The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue. See §§1414, 1415; id., at 208–209. By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.*

62) Parent was correct that "Just Words" is inappropriate for M.O. and other students with Dyslexia, but the hearing officer admonishes parent for not compromising with the educators who offered nothing other than "Just Words". The parent should not have to accept a program she knows to be inappropriate for her son, and about which she continuously provided proof that it is not appropriate. She should expect her opinion and documentation to be weighed heavily.

63) Although FCPS educators proposed an inappropriate program, one that is not evidenced based to meet his unique disability-based needs, for Max for four school years in a row, and continued to propose "Just Words" as adequate for M.O. throughout the hearing, the hearing officer refused parent's request to choose the program with his private providers moving forward for M.O. Instead, the hearing officer stated that deference should be given to the FCPS educators to choose a program that is appropriate for M.O. moving forward. (See Exhibit 1)

64) During an IEP meeting for another parent, witness Dottie Skrincosky expressed concern about FCPS's ability to address the needs of students with Dyslexia. Parent called D.S. as a witness because she expected D.S. to tell the truth. Instead, D.S. committed perjury. Parent had obtained permission of the parent to provide the recording and transcript of her son's IEP meeting, in which D.S. made those comments, to the hearing officer. The hearing officer refused to believe parent's statement that D.S. was committing perjury and refused to allow parent to present the transcript and/or recording as evidence. Although the parent had hard proof, the hearing officer favored FCPS even though FCPS had no hard proof. After the hearing, via a FOIA request, parent obtained an invoice from D.S. to FCPS. Although D.S. was the parent's witness, FCPS paid her to testify and to prep for the hearing with FCPS's counsel. (See Exhibit 1 and Exhibit 19)

## D. Reimbursement for Lindamood-Bell

65) The hearing officer stated, "This claim reaches beyond the statute of limitations and is time-barred. Even if the claim was not time-barred, petitioner failed to provide sufficient evidence during the hearing as to why she should be reimbursed or how much she is seeking as reimbursement. FCPS witnesses testified that Lindamood-Bell was an unnecessary intervention. Dottie Skrincosky and Jugnu Agrawal, both testified that Lindamood-Bell was not an appropriate program for Max. (Tr. Vol. III, at pgs. 157-158 and 170-172). Petitioner failed to sufficiently rebut this premise. I therefore FIND that petitioner failed to meet her burden of proof regarding this issue. Accordingly, petitioner's claim for reimbursement is denied." (See Exhibit 1 and Exhibit 19)

66) Parent's request for Lindamood Bell is not time barred since she has continued to request reimbursement year after year. The request is not time barred.

67) Parent did not request Lindamood Bell at any point during the hearing. Parent requested reimbursement for Lindamood Bell, which M.O. received about 100 hours of training after seventh grade and then again after eighth grade and parent requested a program of her choice moving forward. (See Exhibit 19)

22

68) FCPS experts Dottie Skrincosky and Jugnu Agrawal stated that Lindamood Bell is inappropriate for M.O. moving forward. Parent does not disagree with them. Parent was not requesting Lindamood Bell moving forward and made it clear that she was not requesting Lindamood Bell moving forward, therefore she was not required to meet her burden of proof regarding using Lindamood Bell moving forward. However, Lindamood Bell was appropriate when it was provided to M.O. and evidence presented during the hearing proves that M.O. progressed more in five weeks of Lindamood Bell tutoring than in years of working with FCPS. In addition, the testimonies of Jugnu Agrawal and Dottie Skrincosky, which the hearing officer cited to be credible are in fact problematic. Agrawal states that she made her decision about Lindamood Bell not being appropriate based on the pictures of children on its web site. Scrincosky states she's been told Lindamood Bell doesn't stick, but doesn't provide proof buttressing this statement. (See Exhibit 1)

69) Although Dottie Skrincosky and Jugnu Agraway advocated that "Just Words" is appropriate for M.O., and the hearing officer determined it not to be appropriate for M.O., the hearing officer found D.S.'s and J.W.'s negative comments about Lindamood Bell to be credible. The hearing officer gave weight to the opinions of two "experts" who are at fault for advocating for an inappropriate program. (See Exhibit 1 and Exhibit 19)

### E. 9.2.20 IEP

70) The Hearing Officer ordered that the 9.2.20 IEP be implemented with or without the parent's consent. The IEP has goals and accommodations that are years old and is void of an updated transition plan, accommodations for a year-long virtual school environment, services needed for a year-long virtual school environment, data from the evaluations done in July of 2020, and functional goals and services. (See Exhibit 17)

### F. Request for Speech and Language Pathology Services

71) Throughout the hearing parent and parent's witnesses cited M.O.'s evaluations and that he has higher language order needs. Even FCPS expert Jugnu Agrawal indicated this during her testimony. (See Exhibit 19)

72) In her decision, the hearing officer cites the FCPC speech and language evaluation that states Max has no deficiencies, and thus turns down parent's request for M.O. to receive therapy from a speech language pathologist. The hearing officer failed to cite the July 2020 speech language evaluation of M.O., which is more recent than FCPS's and which was done by a Howard University professor who is a nationally known leader in this field of study, and which states that M.O. does have deficits and the need for such therapy.

73) The hearing officer refused to allow Dr. Jay Lucker, who did M.O.'s most recent speech language evaluation to testify as a rebuttal witness. (See Exhibit 19)

74) The hearing officer almost refused to allow Dr. Lisi Levinsohn to testify as a rebuttal witness on behalf of the parent. The hearing officer limited L.L.'s testimony to barely five minutes and cut her off. (See Exhibit 19)

### G. Parental Consent

75) 8VAC20-81-170 states: "E. Parental consent. 1. Required parental consent. Informed parental consent is required before: a. Conducting an initial evaluation or reevaluation, including a functional behavioral assessment if such assessment is not a review of existing data conducted at an IEP meeting; (34 CFR 300.300(a)(1)(i)) b. An initial eligibility determination or any change in categorical identification; c. Initial provision of special education and related services to a child with a disability; (34 CFR 300.300(b)(1)) d. **Any revision to the child's IEP services;** e. **Any partial or complete termination of special education and related services,** except for graduation with a standard or advance studies diploma; f. The provision of a free appropriate public education to children with disabilities who transfer between public agencies in Virginia or transfer to Virginia from another state in accordance with 8VAC20-81-120; g. Accessing a child's public benefits or insurance or private insurance proceeds in accordance with subsection F of this section;

and (34 CFR 300.154) h. Inviting to an IEP meeting a representative of any participating agency that is likely to be responsible for providing or paying for secondary transition services. (34 CFR 300.321(b)(3))"

76) The hearing officer does not have the authority to override state or federal regulations. Per state and federal regulations, the hearing officer is supposed to make decisions that are based on state and federal regulations.

77) The hearing officer's decision states, "Parental cooperation and corroboration are essential to the IEP process. In this case, witnesses credibly and independently described petitioner's overall conduct during IEP meetings as: violent, challenging, abusive, unreasonable, obstructive, problematic, fixated, aggressive, vitriolic, overboard and interfering.  Petitioner was described to have hit the desk with her hand and aggressively approach team members during meeting(s).  This unacceptable conduct is neither cooperative nor corroborative." These statements do not comport to the audio and transcripts of the meetings. However, hearing officer did not order FCPS to train the parent nor did she order any related service in order to support the parent she deemed to be uncooperative, nor did she order FCPS to provide proof of these statements. Instead, she used FCPS's statements as reasoning to strip parent of her consent rights.

78) As previously proven, the parent was correct in advocating four years in a row against FCPS's inappropriate proposals, thus any "interfering" or anything else FCPS considered to be a negative action toward pushing back against FCPS's proposals was completely appropriate for the parent to take. She was proven correct, that the program proposed four school years in a row is inappropriate for M.O.

## H. More Errors

79) The hearing officer stated M.O. received FAPE because M.O. has progressed and earned good grades. Before Max received an IEP in 7th grade, M.O. had progressed in all grades and had received good grades. Good grades and progression are not an indicator of FAPE per IDEA 2004. (See Exhibit I and IDEA )

80) The hearing officer stated that M.O. passed all of his SOLs. M.O. did not pass all of his SOLs. As documented in the transcripts for the hearing, M.O. failed the reading SOL for the first time in 7th grade and then failed the reading exam again in the 8th grade, and then failed the reading exam again after taking a retake of the exam in 8th grade.

81) The hearing officer stated that M.O. has maintained a grade average above 3.7. This is not accurate and this is supported by a transcript discussed and provided to the hearing officer, which shows M.O. having a D and incomplete grades during the third quarter of the previous school year.

82) The hearing officer stated that Advocate Kandise Lucas stepped in on the final day to help the parent because the parent was having technological issues. As documented in the transcripts, K.L. stepping in because the parent's struggles with her eyes became such an issue that by the final day she hit a point at which reading and seeing clearly were struggles to great to overcome, and because she knew the hearing officer would not agree to finish the hearing on a different day. (See Exhibit 1 and Exhibit 19)

83) The hearing officer admonished the parent for not having the same skillset as the licensed FCPS attorney's in questioning and understanding the legal formalities of a hearing. Yet, she did not order any parent training by FCPS or VDOE so the parent may have an equal standing as the LEA and their attorney's when trying to access her Due Process Rights and Procedural Safeguards. This includes training on the technology that FCPS chose to use to host the hearing. Parent received no advance training on how to upload and share evidence or anything else. (See Exhibit 1 and Exhibit 19)

**WHEREFORE, petitioners asks that this Court enter judgment in her favor against FCPS as follows:**

1. Reverse the findings of the Hearing Officer and enter judgment that the Petitioner is the prevailing party in this due process action.

2. Find that FCPS committed procedural violations of the IDEA which denied Petitioner's child FAPE.

3. Order FCPS to develop and implement an IEP that provides FAPE and order that the IEP team developing the IEP be made up of FCPS and private professionals of mother's choosing, and that FCPS pay for the services of all private professionals.

4. Order that FCPS reimburse the Petitioner for all of the costs associated with all Lindamood Bell services administered to M.O.

5. Order that FCPS provide a written apology to M.O. for discriminating and retaliating against him.

6. Order that FCPS reimburse the Petitioner for the costs associated with all private therapies.

7. Order that FCPS reimburse the Petitioner for the costs associated with her going pro se during a due process hearing and associated with all of the state complaints and Office of Civil Rights complaints that she has filed.

8. Order that educating herself on her son's disabilities and representing her son's disability base needs through private advocacy providers.

9. Award Petitioner's child compensatory education by private placement for services provided by a speech language pathologist, a developmental ophthalmologist, and a life coach of petitioner's choice, for a period between now and when M.O. starts college.

10. Award Petitioner's child compensatory education by private placement for services provided by a life coach of petitioner's choice, for the first school year M.O. attends college.

11. Award Petitioners such other and further relief as is proper.

Respectfully submitted,

by C.O., for C.O. and M.O.

By_____

Parent     Callie Oettinger

8110 Bellingham Court

Fairfax Station, VA 22039

703.371.9242

CALLIEOETTINGER@gmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this day of May 27. 2021 I filed the foregoing with the Clerk of the Court, and requested the sheriff be used to serve the filing to

Jane Strong

Fairfax County Public Schools

8115 Gatehouse Road

Falls Church, VA 22042

*VIRGINIA:*

### DEPARTMENT OF EDUCATION
### DIVISION OF SPECIAL EDUCATION AND STUDENT SERVICES
### OFFICE OF DISPUTE RESOLUTION AND ADMINISTRATIVE SERVICES

**In the matter of**

███████████, a minor,
**by his parent, CALLIE OETTINGER,**                          **Petitioner**

**and**                    **VDOE Case #:  21-009**

**FAIRFAX COUNTY PUBLIC SCHOOLS,**                          **Respondent.**

## HEARING OFFICER DECISION

---

**Present for Hearing, September 30, 2020:**

Rhonda J. S. Mitchell, Hearing Officer
Callie Oettinger, Parent, Petitioner
John Cafferky & Wesley Allen, Counsel for Fairfax County Public Schools (FCPS)
Dawn Schaefer, Coordinator, Due Process and Eligibility, FCPS
Brian Miller, Case Monitor, Virginia Department of Education (VDOE)

**Present for Hearing, October 1, 2020:**

Rhonda J. S. Mitchell, Hearing Officer
Callie Oettinger, Parent, Petitioner
John Cafferky & Wesley Allen, Counsel for FCPS
Dawn Schaefer, Coordinator, Due Process and Eligibility, FCPS
Brian Miller, Case Monitor, VDOE

**Present for Hearing, October 2, 2020:**

Rhonda J. S. Mitchell, Hearing Officer
Callie Oettinger, Parent, Petitioner
John Cafferky & Wesley Allen, Counsel for FCPS
Dawn Schaefer, Coordinator, Due Process and Eligibility, FCPS

**Present for Hearing, October 13, 2020:**

Rhonda J. S. Mitchell, Hearing Officer
Callie Oettinger, Parent, Petitioner
John Cafferky & Wesley Allen, Counsel for FCPS
Dawn Schaefer, Coordinator, Due Process and Eligibility, FCPS

**Present for Hearing, October 14, 2020:**

Rhonda J. S. Mitchell, Hearing Officer
Callie Oettinger, Parent, Petitioner
John Cafferky & Wesley Allen, Counsel for FCPS
Dawn Schaefer, Coordinator, Due Process and Eligibility, FCPS
Brian Miller, Case Monitor, VDOE

**Present for Hearing, October 15, 2020:**

Rhonda J. S. Mitchell, Hearing Officer
Callie Oettinger, Parent, Petitioner
John Cafferky & Wesley Allen, Counsel for FCPS
Dawn Schaefer, Coordinator, Due Process and Eligibility, FCPS
Brian Miller, Case Monitor, VDOE

<u>Present for Hearing, October 19, 2020:</u>

Rhonda J. S. Mitchell, Hearing Officer
Callie Oettinger, Parent, Petitioner
John Cafferky & Wesley Allen, Counsel for FCPS
Dawn Schaefer, Coordinator, Due Process and Eligibility, FCPS
Brian Miller, Case Monitor, VDOE

<u>Hearing Location:</u>
Conducted Virtually - Blackboard Platform

<u>Court Reporter:</u>
Veritext

## <u>INTRODUCTION and PROCEDURAL HISTORY</u>

### *Introduction*

This matter came to be heard upon the filing of a *pro se* request for due process hearing (complaint) by Callie Oettinger (parent or petitioner) against Fairfax County Public Schools (FCPS), on behalf of her minor son, ████████ (███, student or child), pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1415(c)(2)(B). The complaint was filed on August 26, 2020. Fairfax County Public Schools was represented by Attorneys John Cafferky and Wesley Allen from the Law Firm of Blankingship and Keith, Fairfax, Virginia.

The Hearing Officer (HO) was formally appointed by letter dated August 31, 2020 from Dawn Schaefer, Coordinator, Due Process and Eligibility, FCPS, Fairfax, Virginia. The HO formally accepted the appointment by letter dated August 31, 2020. Brian Miller was appointed by the Virginia Department of Education as case monitor on August 31, 2020 and attended five days of the hearing.

The seven day hearing was conducted virtually on September 30, October 1 and 2, 2020. Although scheduled to proceed on October 5 and 7, 2020, the hearing was delayed until October 13 and 14, 2020 due to an unexpected illness of the petitioner. Due to the exchange of seven lengthy exhibit binders and lengthy witness examinations, the hearing was extended to include October 15, 2020. On this date, petitioner's internet connection was lost during the hearing and the hearing was again extended to October 19, 2020.

During the course of this due process proceeding, the HO has:
- o issued a timely prehearing report;
- o rendered timely notices for six prehearing conferences and one mid-hearing conference;
- o provided timely notice of the originally scheduled hearing and amended dates;
- o provided the hearing agenda;
- o conducted six prehearing conference calls and one mid-hearing call;

o entered two decisions on motions
o entered five prehearing orders
o entered a transcript distribution order
o entered a protective order
o entered one post hearing order
o issued one post-hearing decision letter and
o issued a timely case closure report

These documents are incorporated herein by reference, have been placed on record and are filed with the proceedings in this case. A summary of the orders and decisions has been provided in this decision.

### *Prehearing Matters*

From the beginning of this due process procedure, the HO and counsel for FCPS received an overwhelming number of electronic messages (emails or messages) from petitioner expressing various concerns. Throughout the hearing process, a barrage of emails was received from petitioner on almost a daily basis. Among other topics, petitioner expressed concerns about the following matters:

o fairness of the process
o credibility and integrity of potential witness testimony
o integrity of FCPS counsel
o integrity of the hearing moderator
o potential breaches of confidentiality and privacy
o perceived conflicts of interest by counsel for FCPS and the moderator and
o the alleged incomplete delivery of her son's educational records

This continuous stream of emails distracted from the true issues of the case. Nevertheless, the HO made every effort to address petitioner's numerous concerns and to be responsive. Most of petitioner's concerns were addressed by the HO through orders or decisions.

From the outset of this proceeding, petitioner informed the HO that she had previously filed over 30 complaints against FCPS through the Virginia Department of Education (VDOE) complaint process. She claimed to have had success with her complaints and alleged that FCPS was a "habitual offender."

### *The Hearing*

During the hearing, petitioner often questioned the truthfulness of her own witnesses. She also questioned the truthfulness of FCPS witnesses. There were some witnesses that she wanted the HO to designate as hostile. Petitioner would often testify instead of asking a question of the witness. Petitioner would often rephrase the same question over and over in an effort to elicit a different response from the witness. Petitioner was often aggressive and belligerent with witnesses. On one occasion when the HO confronted petitioner's antagonistic behavior towards her own witnesses in an effort to deescalate her questioning techniques, petitioner claimed she was zealously advocating for her son and insinuated that the HO was being unfair.

The hearing was originally scheduled to be conducted on September 29, 30, and October 1, 2020. Notice for these dates was sent by the HO on September 2, 2020. Petitioner was granted a one day delay

to submit her exhibits. Considering the 5-day requirement to submit exhibits, this pushed the date to start the hearing to September 30, 2020. October 2, 2020 was also added. Due to the volume of documents involved, the hearing dates were extended to five days. As rescheduled, the hearing commenced on September 30, 2020 and proceeded on October 1 and 2, 2020. The hearing was scheduled to proceed on October 5 and 7, 2020, however, due to petitioner's on-going eye problems that adversely affected her ability to proceed, the hearing was continued until October 13, 14, and 15, 2020.

Around noon on October 15, 2020, petitioner had internet connection problems and could not reconnect to the site. Around 3:00 PM, it became clear that petitioner was not returning, so the parties informally discussed rescheduling. It was decided that Monday, October 19, 2020 would be scheduled as the last day for the hearing. Notice of this date was sent to all parties.

On the final day of the hearing, October 19, 2020, petitioner was unable to fully connect to the site. Petitioner was able to hear and see the proceedings but her audio connection did not work. Consequently, Kandise Lucas, an experienced advocate, was asked by petitioner to substitute. Ms. Lucas, who it was revealed had been assisting petitioner behind the scenes throughout this proceeding, took over and served as petitioner's representative. Ultimately, petitioner was able to personally deliver her closing argument by telephone connection.

### *Post Hearing Matters*

Post hearing, petitioner began to again send numerous email messages to express concerns. Her concerns included the following matters:

- o Petitioner expressed concern about non-substantive inaccuracies in the transcripts (for example, wrong date that her son attended the hearing). She was instructed by the HO to submit an errata sheet.
- o Petitioner expressed concern about an *ex parte* communication between the HO and FCPS counsel (referring to an off-the-record logistical conversation conducted on October 15th to discuss how to proceed after petitioner did not return to the hearing due to technical issues.) Petitioner insinuated that this conversation was somehow improper and questioned the integrity of both the HO and counsel for FCPS as a result of this off the record conversation.
- o Petitioner insinuated that the moderator intentional muted her audio during the October 19th hearing.
- o Petitioner claimed she was prejudiced because she was unable to testify on the last day of the hearing, despite the fact that she was not scheduled to testify and her name did not appear on either parties' witness list.
- o Petitioner continued her demand for an audio of the transcript, claiming that she was entitled to it.
- o Petitioner alleged a lack of professionalism by counsel for FCPS on October 19th (The allegation is unclear but the assumption is that petitioner did not like counsel's closing argument.)
- o Petitioner complained about the HO's decision to declassify one of her witnesses as an expert. (This decision was made based on petitioner's representation during the hearing that she had previously sent the witness' resume'. However, neither counsel for FCPS nor the HO received the resume'. Petitioner was unable to later forward the message she claimed to have already sent but instead sent a suspicious scanned copy of a message that included the resume'.)

o Petitioner maintained the on-going allegation that FCPS unfairly received the hearing transcript before her or the HO.

Although it is presumed that petitioner was able to hear the hearing on October 19th, petitioner complained to VDOE that neither the case monitor, Brian Miller, nor the virtual moderator, Dawn Schaefer, did anything to assist her with her audio connection. As mentioned above, petitioner unsubstantially insinuated that her microphone had been intentionally muted by the hearing moderator, Dawn Schaefer.

Ultimately, petitioner was able to proceed with the assistance of an experienced advocate, Kandise Lucas, who, without notice, appeared in her stead. Both petitioner and the advocate represented that Ms. Lucas had been helping petitioner throughout the due process proceeding and was therefore familiar with the case. Petitioner was also able to connect via telephone to personally deliver her closing argument.

Despite having addressed this issue at close of the hearing on October 19, 2020, emails were received from petitioner by Veritext, VDOE, the HO and counsel for FCPS requesting an audio recording of the hearing to accommodate her sight problems. Petitioner further complained to VDOE that she was unable to testify at the hearing on October 19, 2020 and claimed they needed to exert oversight regarding these issues as well as the off-record scheduling conversation between the HO and counsel for FCPS as mentioned above.

In regard to the message(s) sent to VDOE, Patricia Haymes, Director of Dispute Resolution, responded by reminding petitioner that the HO remained in charge of the due process proceeding until a final decision was rendered. This would seemingly leave petitioner no choice but to appropriately defer to the HO.

However, petitioner did not accept VDOE's response but instead wrote back alleging that VDOE was responsible for oversight and shifted the topic to transcript delivery. Petitioner alleged that VDOE should be concerned about alleged early transcript distribution to counsel for FCPS and Dawn Schaefer. This alleged infraction had already been addressed by the HO through a transcript distribution order entered on October 9, 2020. It is here noted that petitioner unusually took it upon herself to personally contact several employees of Veritext, the transcription service, to ascertain information about transcript delivery.

In reference to petitioner's request for an audio version of the hearing, this issue was addressed at close of the hearing on October 19th. Both counsel for FCPS and the HO agreed that they had no objection to petitioner receiving audio of the proceedings due to her eye condition, but that the final decision whether to release the audio or not would depend on the policy of the transcription service, Veritext.

After that, petitioner directly contacted the court reporter for the audio and the resulting message indicated variance on this issue between petitioner and the court reporter. The court reporter deferred to Veritext. Petitioner did not agree with the court reporter's position on the issue. After receipt of a message from petitioner on October 24, 2020 that was also sent to Veritext employees plus the overall commotion associated with this issue, the HO ultimately issued a decision on October 24th denying petitioner's request for an audio of the hearing. Moreover, petitioner was already scheduled to receive a hard copy and electronic copy of the transcript to be paid for by FCPS.

Post hearing, petitioner suggested that she might require a delay in the submission of her closing brief. The request was denied. Petitioner did in fact timely submit a 146-page closing brief.

On October 24, 2020, the HO issued a post hearing decision addressing the requested delay as well as the audio issue. The decision also addressed exhibit objections and a witness objection as noted by counsel